**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WAYNE MCNEIL, | : | |
|    Plaintiff, | : | |
| | : | CIVIL ACTION |
|    v. | : | |
| | : | NO. 13-1947 |
| GREYHOUND LINES, INC., | : | |
|    Defendant. | : | |

November __25_, 2014                                             Anita B. Brody, J.

<u>**MEMORANDUM**</u>

Plaintiff Wayne McNeill[1] brings suit against his former employer, Defendant Greyhound

Lines, Inc. ("Defendant" or "Greyhound").  McNeill alleges that Defendant Greyhound, through

its managers, supervisors, agents, and employees, subjected him to disparate treatment because

of his race and gender and retaliated against him, all in violation of Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq*.[2]  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331,

1343, and 1367.

   Defendant moves for summary judgment on all of McNeill's claims.[3]  For the reasons set

forth below, I will grant Defendant's motion and dismiss Plaintiff's Complaint.

---

[1] The case caption lists the Plaintiff as Wayne McNeil, but both parties refer to the Plaintiff as Wayne
McNeill.  I will refer to the Plaintiff as "McNeill" to reflect the parties' usage.
[2] The legal standards for analyzing McNeill's Title VII and PHRA claims are the same for purposes of
summary judgment.  Jones v. Sch. Dist., 198 F.3d 403, 409 (3d Cir. 1999).  Therefore, in addressing the
merits of those claims, this opinion will only reference Title VII because any result reached under it
applies equally to McNeill's claims under the PHRA.
[3] On November 5, 2013, I granted Defendant Greyhound's Motion to Dismiss McNeill's disparate impact
gender discrimination claim with prejudice and McNeill's disparate impact race discrimination claim

I.    BACKGROUND[4]

Plaintiff Wayne McNeill is an African American male who has worn his hair in dreadlocks since 2007.  Pl.'s Dep. 128:21-23.  McNeill worked for Defendant Greyhound as a bus driver from June 13, 1998 until his termination on January 3, 2013.  Id. 72:9-10; 77:9-12.

A.    McNeill's Hiring and Work History at Greyhound

In April 1998 Greyhound hired McNeill to work as a bus driver.  Id. 71:22-72:16. During his training period in April and May 1998, McNeill received the Greyhound drivers' rule book and work rules, which explain the types of employee conduct that can result in termination, such as insubordination or discourtesy to any customer.  Def.'s Br. Ex. B; id. Ex. C; Pl.'s Dep. 89:5-90:5.  After McNeill completed his training, he started working as a driver on June 13, 1998. Pl.'s Dep. 72:5-10.  During his career with Greyhound, he was based out of the Philadelphia terminal.  Id. 90:9-15.  His routes often included a layover in Scranton, Pennsylvania.  Id. 127:21-128:20.

Reginald James was one of McNeill's supervisors from early 2000 until McNeill's termination, first as the Philadelphia operations supervisor and subsequently as the Philadelphia operations manager.  James Dep. 5:15-16; 18:1-14.  James supervised 70 to 80 drivers, with whom he interacted on a daily basis during their shifts.  Id. 21:21-22:1; 22:8-23:7.  Although James was the driver manager, during the last few years of his employment McNeill directly reported to Roger Gibson, who ran the Philadelphia bus station.  Pl.'s Dep. 75:3-5, 16-25.

---

without prejudice.  Plaintiff McNeill did not amend his Complaint.  ECF No. 32.  His remaining claims are for disparate treatment because of his race and gender and for retaliation.

[4] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (alteration in original) (internal quotation marks omitted).  Where facts are disputed, McNeill's account of the facts will be taken as true for the purposes of this motion.

During those years McNeill's immediate supervisors were Christopher Wilson and Sam Dixon.

Id. 75:6-12.

### B.    Greyhound Employment and Termination Policies

In 2012 McNeill received a copy of Greyhound's grooming policy.  Id. 133:10-21; Def.'s

Br. Ex. D.  Greyhound's hair styling and coloring policy for men states:

> Hair should be neatly combed and trimmed, cut and tapered so it does not extend
> beyond or cover any part of ears and does not stick out over shirt collar.  Extems
> [sic] in dyeing, bleaching or coloring are unacceptable.  If hair color is changed, it
> must be natural looking in appearance and well-maintained.

Def.'s Br. Ex. D (Field Employee Grooming Standards and Dress Code Guidelines).

> Greyhound's hair styling and coloring policy for women states:

> Hair should be neatly combed, trimmed and styled away from face.  Extremes in
> dyeing, bleaching or coloring is unacceptable.  If hair color is changed, it must be
> natural in appearance and well-maintained.

Id.

The grooming policy does not prohibit drivers from wearing dreadlocks.  Pl.'s

Dep. 142:23-25.

Since James has worked as a supervisor, he does not know of any employees who have

been terminated for violating the grooming policy.  James Dep. 30:16-17; 36:5-24.  Employees

have been terminated for customer complaints and for getting into accidents.  Id.  29:20-30:7.

They have also been terminated for violating the "G4" personal conduct/courtesy policy.  Id.

30:20-21; 39:7-42:6.  The "G4" policy states: "It is the driver's responsibility to be pleasant and

courteous in dealing with passengers, regulatory or enforcement authorities, the public, and

fellow employees. To avoid an argument, where possible, the dispute shall be referred to a

supervisor or to resolve whatever problems exist."  Def.'s Br. Ex. P.

In making a termination decision, a Greyhound manager may consider an employee's

safety infractions regardless of when they occurred.  James Dep. 89:20-90:4.  A Greyhound

manager may also consider an employee's non-safety violations from the previous twenty-four months. Id. 90:5-14.

### C. The Conflict Between McNeill's Hairstyle and the Greyhound Grooming Policy

In 2007 McNeill began wearing his hair in dreadlocks. Pl.'s Dep. 128:21-23. At work he kept his hair "tied back in a ponytail" hanging down his back. Id. 113:9-14. He preferred not to tie his hair up off of his back or to put it under a hat. Id. 114:10-19. However, he could tie his hair up. Id. 114:20-23.

After McNeill began wearing his hair in dreadlocks, McNeill's supervisors told him he had to wear his hair up or under his hat in compliance with the grooming policy. Pl.'s Dep. 203:8-14. He was told "[he] ha[s] to do something about [his] hair" and he must "tie it up, cover it up. Do something with it." Id. 257:19-20. McNeill was not the only employee who violated the grooming policy. James Dep. 28:18-29:1. Disciplinary decisions for grooming policy violations are handled by employees' managers and "depend[ ] on the manager, depend[ ] on the situation." Fleischhauer Dep. 73:5-17. Each violation is "handled individually." Id. 73:19.

### D. Incidents

Greyhound disciplined McNeill several times between 1999 and 2010 for poor attendance, missing logs, failing to load freight onto his bus, and failing to follow directions related to a customer complaint. See Def.'s Br. Exs. E, F, H, I, J, K, L; Pl.'s Dep. 205:2-12; 205:24-206:22. In May 2002 McNeill was driving a Greyhound bus when he got into an accident because he failed to yield right-of-way. Def.'s Br. Ex. G. For this incident McNeill appeared before Michael Fleischhauer, who was then Greyhound's District Manager. Pl.'s Dep. 208:6-20. Fleischhauer found McNeill at fault. Id. 208:23-25.

### 1. Interactions with Fleischhauer

Michael Fleischhauer currently serves as Greyhound's Regional Vice President for the Northeast.  Fleischhauer Dep. 6:21-22.  He is based out of Greyhound's New York City office but travels throughout the Northeast region from Montreal, Canada to Charlotte, North Carolina.  Id.  54:15-16; 56:20-23.  Fleischhauer "implement[s] the procedures and policies of Greyhound in that area."  Id. 7:2-6.  He is "not involved in the day-to-day running of . . . what happens with drivers in the various locations," nor is he informed when an employee is terminated.  Id. 24:8-11; 28:3-10.

McNeill was one of 700 drivers employed by Greyhound in the Northeast district.  Id. 18:13-15.  In total, the Northeast district covers more than 1,000 employees. Id. 28:8-10.  Fleischhauer knew of McNeill, and from 2009 to 2011 they interacted in passing regularly in Greyhound's New York City terminal. Id. 49:18-50:7, 50:24-51:5; Pl.'s Dep. 176:5-8, 177:5-25.  Fleischhauer noticed that McNeill wore his dreadlocks past his collar and hanging down his back in violation of Greyhound's grooming policy.  Fleischhauer Dep. 66:20-67:3, 68:2-7.  Around 2009 Fleischhauer began to warn McNeill that he needed to put his hair under his hat or face discipline.  Pl.'s Dep. 177:20-25. Though Fleischhauer does not remember the contents of these conversations beyond saying hello, McNeill maintains that Fleischhauer warned McNeill every time they spoke.  Id. 257:24-25; Fleischhauer Dep. 53:6-9; 54:1-9; 65:1-19.  By 2011 McNeill and Fleischhauer stopped having these informal conversations.  Pl.'s Dep. 176:10-20.

Fleischhauer communicated his observation of McNeill's grooming policy violation to McNeill's manager.  Fleischhauer Dep. 68:18-19.  However, Fleischhauer does not recall when, to whom specifically, or how he communicated this observation.  Id. 69:22-71:5.  After Fleischhauer referred his observation to McNeill's manager, Fleischhauer did not keep track of

McNeill's grooming issue.  Id. 71:18-22.  James, one of McNeill's supervisors, never received

any communications from any supervisor or Greyhound official regarding McNeill's

noncompliance with the grooming policy.  James Dep. 62:21-64:5.

### 2.  The March 2011 Deviation from Route Suspension

In late February 2011, McNeill was driving a route from Philadelphia to Scranton when

Mark Black, a Greyhound pool manager, conducted a road check.  Id. 49:20-21.  A "road check"

is performed when a Greyhound official is driving in a company vehicle and sees a Greyhound

bus.  Id. 50:20-51:2.  The official must follow the Greyhound bus to make "sure [the driver is]

meeting the Greyhound safe driving standards."  Id.  50:24-51:2.  After driving through Mt.

Pocono on his way to Scranton, McNeill drove back to Mt. Pocono and stopped at a local

Walmart, where he stayed for two hours.  Pl.'s Dep. 263:10-12; 264:11-14, 18-21; Def.'s Br. Ex.

N.  Black determined that McNeill deviated from his route by driving to the Walmart.  Def.'s Br.

Ex. N. Although Black cited McNeill for not wearing his Greyhound uniform vest, McNeill was

wearing his vest that day.  Pl.'s Dep. 267:4-5; Def.'s Br. Ex. N.  Black observed—and McNeill

does not dispute—that McNeill's "braided hair was over his jacket collar to his shoulder blades."

Def.'s Br. Ex. N; Pl.'s Dep. 267:8-16.  Black also noted that McNeill had a female companion—

another Greyhound driver from New York—with him.  Def.'s Br. Ex. N; Pl.'s Dep. 267:17-20,

25.  Black cited McNeill in violation of Greyhound's uniform policy and for deviating from his

route.  Def.'s Br., Ex. M; Pl.'s Dep. 203:8-14.  McNeill was then suspended without pay for

three days from March 8 to March 11, 2011.  Def.'s Br. Ex M; Pl.'s Dep. 262:10-25.

### 3.  The November 2011 Suspension

In early fall 2011 James noticed that McNeill was violating the grooming policy by

wearing his hair below his collar.  James Dep. 47:2-48:11; 52:7-22.  James had mentioned the

grooming policy to McNeill on several earlier occasions.  Id. 48:9-10; Pl.'s Dep. 203:8-14.

James called McNeill into his office to explain the grooming policy.  James Dep. 47:12-13.

McNeill "was being defiant. . . . Basically, he was upset that why was [James] picking on him?

And that there was other people that was walking around and [Greyhound] wasn't saying

anything to."  Id. 47:12-24.

On November 3, 2011 James and district manager Evan Burak observed McNeill in the

Philadelphia Greyhound terminal.  McNeill's hair was tied up but a few strands might have hung

down, and his hair might have been below his shirt collar.  Pl.'s Dep. 286:11-23.  Burak asked

McNeill "Wayne, you're taking care of that problem?"  Id. 201:14-18; James Dep. 49:8-9; Def.'s

Br. Ex. O.  McNeill responded "What problem? I don't have a problem."  Pl.'s Dep. 201:20-21.

According to James, McNeill replied to Burak with a "smart remark," made a noise, and then

walked out.  James Dep. 49:8-12.  On November 8, 2011 James called McNeill to his office,

cited him for violating the grooming policy and for responding to Burak in a "sarcastic way,"

and suspended him without pay for three days from November 9 to November 11, 2011.  Def.'s

Br. Ex. O; James Dep. 49:13-15; Pl.'s Dep. 290:12-25.  The personnel record entry for this

incident explained that McNeill violated the policy by having his "braids falling down below

[his] shirt collar" because "[i]t is the driver[']s responsibility to have this hair neatly comb and

trim, cut and tapered so it does not extend below will cover any parts of ears and does not stick

out over sh[i]rt collar."  Def.'s Br. Ex. O.  Greyhound concluded that McNeill's "attitude

towards the company policy [was] unacceptable and will not be tolerated[.]  [T]his is a violation

of Greyhound grooming standard in dress code policy."  Id.

### 4.   The December 2012 Sugarloaf Incident and Termination

On December 22, 2012 Greyhound bus driver Dana Hawkins was en route to New York City from Cleveland when her bus broke down in Sugarloaf, Pennsylvania.  Pl.'s Dep. 327:12-21.  Greyhound needed another driver to rescue Hawkins' stranded passengers.  McNeill, on his layover in Scranton, was the closest available driver.  Kathy Marquat, a Greyhound dispatcher in Dallas, Texas, contacted McNeill and asked him to drive his empty bus to Sugarloaf and then "cushion" the bus; that is, to wait at the broken-down bus for the tow truck while Hawkins would drive the passengers to New York City.  Pl.'s Dep. 330:17-331:15; 336:16-24; 353:4-6.  When McNeill arrived in Sugarloaf, Hawkins' passengers boarded his bus.  Pl.'s Dep. 381:10-12; Def.'s Ex. Q.  One passenger remained on Hawkins' bus since he had arranged for a ride from Sugarloaf.  Hawkins did not tell McNeill about the passenger's alternate transportation arrangement.  Pl.'s Dep. 344:3-16.

When McNeill boarded the stranded bus, he and Hawkins disagreed about which driver should finish the route.[5]  Id. 353:10-25; Def.'s Br. Ex. P.  They used Hawkins' cell phone to call Marquat, the dispatcher.  Pl.'s Dep. 363:2-6.

Hawkins told McNeill she did not have the hours in her schedule to drive the rest of the route.  Id. 344:21-25.  However, Marquat told McNeill that Hawkins still had hours to drive.  Id. 346:7-14.  Marquat did not tell McNeill that he had to drive, and at no point did McNeill tell Marquat or Hawkins that he would not drive.  Id. 353:7-9; 359:17-22.  Hawkins then told McNeill and Marquat that she was too tired to drive the rest of the route.  Id. 344:17-25.  However, because Hawkins still had hours on her schedule, McNeill wanted her to drive.  Id. 366:3-7.

---

[5] According to Hawkins, McNeill cursed and called her lazy.  Def.'s Br. Ex. Q.  McNeill denies using profane language or calling Hawkins lazy.  Pl.'s Dep. 359:9-13.

The call was escalated to Michael Massinburg, the manager in Texas. <u>Id.</u> 363:7-19; 366:3-14. Massinburg told McNeill that the passengers would suffer if McNeill and Hawkins did not work out their disagreement. <u>Id.</u> 366:19-24. Massinburg told McNeill to drive the bus. <u>Id.</u> 367:13-15. McNeill decided he would have to drive the bus. <u>Id.</u> 366:24-367:1. James, McNeill's supervisor, then called McNeill on his cell phone. <u>Id.</u> 366:16-17; 371:13. After McNeill explained the situation, James asked McNeill to "be the bigger person" and McNeill told James he would drive the bus. <u>Id.</u> 371:23-372:13; 375:3-11. After McNeill spoke with James, he left the stranded bus. <u>Id.</u> 374:6-8. As he left, Hawkins told him "you're a joke." <u>Id.</u> 374:19-21. McNeill did not tell Hawkins he would drive the rescue bus. <u>Id.</u> 375:12-16. He assumed Hawkins would wait for the tow truck. <u>Id.</u> 380:20-381:2. Nor did he say anything to the passenger who remained on the stranded bus.[6] <u>Id.</u> 375:12-16. McNeill assumed that Hawkins had already taken care of that passenger.[7] <u>Id.</u> 381:3-382:6. McNeill returned to his bus, where the other passengers were waiting, and drove them to New York City. <u>Id.</u> 375:20-25.

James investigated the Sugarloaf incident. James Dep. 68:3. Greyhound took statements from Hawkins as well as McNeill; Massinburg emailed James to explain the incident. Def.'s Br. Ex. Q. Pursuant to Greyhound policy, James reviewed McNeill's personnel file for safety violations throughout his employment and non-safety violations documented within the previous twenty-four months of employment. James Dep. 89:20-90:14. In his deposition, James stated that McNeill was terminated primarily because of the Sugarloaf incident, but that "it[ ] [was] not the one incident. We consider[ed] his whole record." <u>Id.</u> 65:14-17; 75:21-76:10. James also stated that McNeill's EEOC filings did not factor into Greyhound's termination decision. <u>Id.</u>

---

[6] Both parties agree that the passenger arranged to be picked up at the site of the stranded bus. While they vigorously dispute whether McNeill properly left the passenger on the bus (with Hawkins) or deserted the passenger, that fact is immaterial to the instant motion for summary judgment.
[7] According to Hawkins, the passenger tried to ask McNeill a question as he left the bus but McNeill ignored him. Def.'s Br. Ex. Q.

69:2-8.  James recommended termination, and after he discussed the incident and McNeill's

record with Roger Gibson (Greyhound city manager) and Jared Norman (human resources

regional manager), they decided to terminate McNeill.  Id. 61:19-62:10; 68:1-9.  On January 3,

2013 McNeill was fired.  Fleischhauer was not involved in the decision to terminate McNeill.

Fleischhauer Dep. 26:17-23, 40:19-22.

In the personnel record entry documenting McNeill's termination, Greyhound cited

McNeill for violating the driver rule G-4 Personal Conduct/Courtesy.  Def.'s Br. Ex. P.

Greyhound explained that during the Sugarloaf incident McNeill "failed to display

professionalism while dealing with a fellow co-worker."  Id.  Greyhound viewed this incident as

a serious violation warranting termination.  The personnel record entry reads: "Due to the

seriousness of this infraction in conjunction with your previous record your employment with

Greyhound Lines Inc has been terminated."  Id.

### E.  McNeill's EEOC and Pennsylvania Human Rights Commission Complaints

On May 3, 2011 McNeill filed complaints with the EEOC and the Pennsylvania Human

Rights Commission ("PHRC").  Def.'s Br. Ex. U.  These complaints followed the March 2011

incident in which McNeill was suspended for deviating from route and for violating the uniform

policy.  On November 14, 2011 McNeill filed a second set of complaints with the EEOC and

PHRC.  Def.'s Br. Ex. U.  These complaints followed McNeill's November 2011 suspension for

violating the grooming policy as observed by James and Burak.  In his second EEOC complaint,

McNeill identified four black female employees who wore their hair below their collars in

violation of Greyhound's grooming policy but were not disciplined.  Id.

Greyhound's human resources department generates a report listing the employees who

have filed EEOC claims.  Fleischhauer Dep. 47:9-48:7.  James knew of McNeill's previous

10

EEOC claims and went to an EEOC hearing with McNeill.  James Dep. 68:10-18.  Fleischhauer

learned of McNeill's EEOC claim only when he learned of McNeill's termination.  Fleischhauer

Dep. 46:7-16, 48:20-49:1.

## II.   LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56.  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the

evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986) (internal quotation marks omitted).  After the moving party has met its initial

burden, the nonmoving party must then "make a showing sufficient to establish the existence of

[every] element essential to that party's case, and on which that party will bear the burden of

proof at trial."  Id. at 322.  In ruling on a motion for summary judgment, the court must draw all

inferences from the facts in the light most favorable to the nonmoving party.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Galena v. Leone, 638 F.3d 186, 196

(3d Cir. 2011).  However, the nonmoving party may not "rely merely upon bare assertions,

conclusory allegations or suspicions" to support its claims.  Fireman's Ins. Co. of Newark, N.J.

v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## III.   DISCUSSION

McNeill brings claims of race discrimination, gender discrimination, and retaliation, all in violation of Title VII and the PHRA.

### A.   Title VII and PHRA Gender and Race Discrimination Claims

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or natural origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII disparate treatment claims may be proven by direct or indirect evidence.  Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  Here, McNeill offers only indirect evidence of race and gender discrimination in Greyhound's decision to terminate his employment.  Thus, his claims may proceed through the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, the plaintiff must establish a prima facie case of discrimination.  In order to establish a prima facie case of disparate treatment under Title VII, a plaintiff must show the following: "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was . . . fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  Jones v. Sch. Dist., 198 F.3d 403, 410-11 (3d Cir. 1999) (internal quotation marks omitted).  As an alternative to the fourth prong, a plaintiff may show "that similarly

situated individuals outside the plaintiff's class were treated more favorably [than he]."
Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273-74 (3d Cir. 2010).  If a plaintiff
establishes a prima facie case, he "in effect creates a presumption that the employer unlawfully
discriminated against [him]."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254
(1981).

Second, if the plaintiff establishes a prima facie case, then the burden shifts to the
employer, who "must articulate a legitimate, non-discriminatory reason for its employment
decision."  Smith v. Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998).  The employer's
burden at this stage is "relatively light," and requires only an articulation of "a legitimate reason
for the unfavorable employment decision" in question.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d
Cir. 1994).  The Supreme Court has described the burden as "one of production, not persuasion;
it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 142 (2000) (citation omitted).  "The employer need not prove that the tendered reason
*actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden
of proving intentional discrimination always rests with the plaintiff."  Fuentes, 32 F.3d at 763.  If
the employer articulates a legitimate reason, then the presumption of intentional discrimination,
"having fulfilled its role of forcing the defendant to come forward with some response, simply
drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993) (citing
Burdine, 450 U.S. at 254).

Third, "the burden then reverts to the plaintiff to prove by a preponderance of the
evidence that the articulated reason is a pretext."  Smith, 147 F.3d at 278.  This requires the
identification of "some evidence, direct or circumstantial, from which a factfinder could
reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

As to the first prong, evidence to disbelieve the employer's articulated reasons, "[t]he plaintiff can discredit the [defendant's] proffered reasons by 'demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons.'" Anderson, 621 F.3d at 277 (quoting Fuentes, 32 F.3d at 765). A plaintiff must show "that the employer's proffered reason . . . was so plainly wrong that it cannot have been the employer's real reason." Mikell v. Marriott Int'l, Inc., 789 F. Supp. 2d 607, 617 (E.D. Pa. 2011) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)). See also Ade v. KidsPeace Corp., 401 F. App'x 697, 703 (3d Cir. 2010) ("A denial that [a plaintiff] engaged in the conduct for which he [or she] was purportedly terminated is insufficient to create a genuine issue of material fact.") (citation omitted); Rabinowitz v. AmeriGas Partners, L.P., 252 F. App'x 524, 528 (3d Cir. 2007) ("[A] plaintiff may not defeat summary judgment merely by questioning the business judgment behind an employer's decision, absent other evidence of impermissible motives.") (citation omitted).

As to the second prong, to demonstrate that race was more likely than not a motivating or determinative cause of the employer's action, "the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 765).

### 1.  Disparate Treatment Race Discrimination Claim

#### a.  Step One: Prima Facie Case

To establish a prima facie case of race discrimination, McNeill must show that "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was . . . fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  Jones, 198 F.3d at 410-11.  The parties do not dispute that McNeill has established the first three elements of a prima facie case, though they dispute whether he has provided sufficient evidence of the fourth element, circumstances that give rise to an inference of unlawful discrimination or the existence of more favorably treated individuals outside of McNeill's protected class.  For the purposes of this motion, I will assume McNeill has established a prima facie case.

#### b.  Step Two: Legitimate, Non-Discriminatory Reason

Assuming that McNeill established his prima facie case, then Greyhound "must articulate a legitimate, non-discriminatory reason for its employment decision."  Smith, 147 F.3d at 278.  Greyhound has set forth a legitimate, non-discriminatory reason for McNeill's termination.  Greyhound fired McNeill following the December 22, 2012 Sugarloaf incident.  Greyhound concluded that McNeill violated Greyhound's professionalism policy due to his interactions with Hawkins (the driver of the broken-down bus) and the remaining passenger.  Greyhound has met its burden of production.

#### c.  Step Three: Pretext

To establish pretext, McNeill must proffer evidence that the employer's reason is unbelievable or implausible, or evidence that discrimination was more likely than not the

motivating cause of Greyhound's decision to terminate him.  Fuentes, 32 F.3d at 764.  McNeill's

disparate treatment claim fails because he has produced insufficient evidence to raise a genuine

issue of material fact as to whether Greyhound's legitimate, non-discriminatory reason for

terminating him was pretext for race discrimination.

### i.       Believability of Greyhound's Articulated Reason for Termination

McNeill has failed to show that a reasonable factfinder could rationally find that

Greyhound's proffered explanation is so implausible as to be unworthy of credence.  Anderson,

621 F.3d at 277.  Greyhound determined that McNeill acted unprofessionally in disagreeing with

Hawkins about which driver should drive the passengers to their final destination.  Because

McNeill and Hawkins could not agree, the dispute was escalated to several supervisors before it

was resolved.  McNeill claims that he only followed instructions—initially that Hawkins would

drive the bus and he would ride the bus.  Once his supervisors changed the instructions and told

him to drive, he complied.  In his view, he did not act unprofessionally.  Additionally, because

Greyhound does not dispute that one passenger arranged to be picked up at the stranded bus,

McNeill argues that Greyhound's attempt to blame him for leaving that passenger behind

discredits its reason for termination.

McNeill suggests that Greyhound "blindly accepted" Hawkins' account of the Sugarloaf

incident because "Greyhound was waiting for a reason to retaliate against [him]." Pl.'s Opp. at 2.

However, an employer may use "statements and complaints by co-workers when making a

decision to terminate an employee," and "the employee cannot later establish pretext by simply

challenging the veracity of such statements."  McCormick v. Allegheny Valley Sch., No. 06-

3332, 2008 WL 355617, at *16 (E.D. Pa. Feb. 4, 2008).  "So long as the decision-maker

reasonably credited the allegations, an employee's denial is not enough to establish pretext." Id. There is no evidence that Hawkins lied about the Sugarloaf incident, other than McNeill's denial of her version of events. See Ade, 401 F. App'x at 703 (plaintiff's denial of conduct insufficient to defeat summary judgment).

Although McNeill offers a different account of the Sugarloaf incident, Greyhound's conclusions about McNeill's conduct are plausible. Regardless of these differing accounts, McNeill has not succeeded in discrediting Greyhound's proffered reason for terminating him that would satisfy the requirement of finding pretext on this basis.

### ii.    Discrimination As a Motivating Cause for Termination

Next, McNeill argues that Greyhound's discriminatory animus more likely motivated his termination than did the Sugarloaf incident because Greyhound previously discriminated against him. Simpson, 142 F.3d at 645. As his evidence, McNeill argues that the regional vice-president, Fleischhauer, instituted a scheme to get rid of McNeill because of his race and hairstyle by repeatedly disciplining McNeill to create a record that could later be used to terminate him. Pl.'s Opp. at 12. Fleischhauer encountered McNeill on several occasions and disliked McNeill's dreadlocks. After observing McNeill violating the grooming policy, Fleischhauer mentioned his observation to one of McNeill's managers. According to McNeill, Fleischhauer then issued a directive to McNeill's managers to "unevenly scrutinize [his] appearance." Id. at 7. Fleischhauer could not recall when, how, or to whom he communicated his observation, nor is there any evidence in the record of a directive from Fleischhauer targeting McNeill. McNeill offers no evidence that any of his supervisors ever received any communications from Fleischhauer regarding McNeill's noncompliance with the grooming

policy.  McNeill has not offered any evidence to show Fleischhauer's observation in any way motivated other Greyhound supervisors to discriminate against McNeill.

Further, McNeill's interactions with Fleischhauer ceased in 2011 at the latest, and Greyhound did not fire McNeill until January 2013.  The amount of time between the two events discredits McNeill's argument that discriminatory animus rather than the Sugarloaf incident motivated Greyhound's decision to terminate him.  Nothing in the record—and certainly not temporal proximity—connects Fleischhauer's observation with McNeill's subsequent termination.  Moreover, there is no evidence that Fleischhauer was involved in the decision to terminate McNeill.  McNeill has not demonstrated that Fleischhauer's discriminatory animus motivated McNeill's termination.

McNeill also points to the absence of disciplinary action against other African-American male drivers who wore dreadlocks past their collars.[8]  That these drivers were not disciplined tends to support Greyhound's contention that it did not discriminate against McNeill on the basis of race.  See Eatman v. United Parcel Serv., 194 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2002) (finding that the plaintiff's allegation of discrimination based on UPS's appearance policy "does not logically support the inference that UPS is dissembling in order to cover up its discriminatory animus towards African-Americans," because other black drivers with dreadlocks were not fired).  Further, McNeill has not identified any non-protected similarly situated individuals who were treated more favorably than he was despite their violations.  Similar to the insufficiency of the evidence of Fleischhauer's disciplinary scheme, this evidence is insufficient to demonstrate that discriminatory animus motivated McNeill's termination.

---

[8] Record evidence about these drivers is not included in the facts section because, although raised by McNeill, the facts are actually inconsistent with his claim.  The inquiry is whether similarly situated individuals *outside* of the plaintiff's protected class were treated more favorably.  See Crumpton, 305 F. Supp. 2d 465, 473-74 (E.D. Pa. 2004).

The evidence in the record is insufficient to establish that Greyhound's reason for terminating McNeill was pretext for race discrimination.  I will grant Greyhound's motion for summary judgment on this claim.

### 2.  Disparate Treatment Gender Discrimination Claim

#### a.  Step One: Prima Facie Case

To establish a prima facie case of gender discrimination, McNeill must show that "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was . . . fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." <u>Jones</u>, 198 F.3d at 410-11.  There is no dispute that McNeill has established the first three elements of his prima facie case.  Although case law indicates that the existence of distinct grooming policies for male and female employees does not violate Title VII unless the policies are unevenly enforced, I will assume for the purposes of this motion that McNeill has established a prima facie case of disparate treatment based on gender discrimination.

#### b.  Step Two: Legitimate, Non-Discriminatory Reason

Assuming McNeill has established a prima facie case of gender discrimination, Greyhound "must articulate a legitimate, non-discriminatory reason for its employment decision."  <u>Smith</u>, 147 F.3d at 278.  Greyhound proffered such a reason for terminating McNeill: his unprofessionalism during the December 22, 2012 Sugarloaf incident along with his prior record.

#### c.  Step Three: Pretext

The burden now shifts back to McNeill to demonstrate that Greyhound's proffered reason was pretext for gender discrimination.  To show pretext, McNeill must either show that

Greyhound's proffered reason is unbelievable or that gender was more likely than not a motivating or determinative cause of the Greyhound's action. Fuentes, 32 F.3d at 764.

First, as discussed above, Greyhound's reason for terminating McNeill is plausible. McNeill has failed to show that a reasonable factfinder could rationally find that Greyhound's proffered explanation is so implausible as to be unworthy of credence. Anderson, 621 F.3d at 277.

Second, McNeill has not shown that gender more likely than not motivated Greyhound's termination decision. "Neither the Supreme Court nor the Court of Appeals for the Third Circuit has considered hair-length policies specifically in the context of a disparate treatment claim." Dodd v. SEPTA, No. 06-4213, 2007 WL 1866754, at *4 (E.D. Pa. June 28, 2007) (granting defendant's motion to dismiss plaintiff's gender discrimination claim). However, the Third Circuit has ruled that "dress codes are permissible under Title VII as long as they, like other work rules, are enforced even-handedly between men and women, even though the specific requirements may differ." Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 181 (3d Cir. 1985), overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see also Dodd, 2007 WL 1866754, at *4-5 (concluding that male plaintiff with dreadlocks lacked gender-based Title VII claim where he "merely allege[d] that female employees were permitted to wear their hair in ponytails" and that he was not). Other circuit courts to consider grooming policies have held that an employer's regulation of its male employees' hair length does not violate Title VII. Dodd, 2007 WL 1866754, at *4 (collecting cases from the Second, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, and D.C. Circuits).[9]

---

[9] See Frank v. United Airlines, Inc., 216 F.3d 845, 854 (9th Cir. 2000); Harper v. Blockbuster, 139 F.3d 1385 (11th Cir. 1998); Tavora v. N.Y. Mercantile Exch., 101 F.3d 907 (2d Cir. 1996); Barker v. Taft Broad. Co., 549 F.2d 400 (6th Cir. 1977); Earwood v. Cont'l Se. Lines, Inc., 539 F.2d 1349 (4th Cir. 1976); Knott v. Mo. Pac. R.R., 527 F.2d 1249 (8th Cir. 1975); Willingham v. Macon Tel. Publ'g Co., 507

McNeill has not provided sufficient evidence that Greyhound unevenly enforced its male and female grooming policies to sustain his claim of disparate treatment based on gender discrimination.  In his November 2011 EEOC complaint, McNeill identified four black female drivers who wore their hair over their collars or in dreadlocks but were not disciplined.  Def.'s Br. Ex. U.  McNeill also suggests that female drivers violate the grooming policy's restrictions on hair color, fingernail length, and jewelry size but are not disciplined.  Pl.'s Dep. 144:13-145:25.  Beyond listing the names of four female drivers in his EEOC complaint, McNeill has not offered into the record any information about these drivers. McNeill's unsubstantiated assertions do not establish that Greyhound treated female drivers more favorably than male drivers by unevenly enforcing the grooming policies.  McNeill's bare allegations that Greyhound used the Sugarloaf incident as pretext for firing McNeill based on his gender fall short of the evidence required at this stage.

McNeill cannot establish pretext and his disparate treatment claim based on gender discrimination fails.  I will grant Greyhound's motion for summary judgment on this claim.

### B.  Title VII and PHRA Retaliation Claims

McNeill alleges that Greyhound retaliated against him for filing EEOC and PHRC complaints in May and November 2011.  Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e–3.  In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a protected employee activity; (2) he suffered an adverse

---

F.2d 1084 (5th Cir. 1975); Baker v. Cal. Land Title Co., 507 F.2d 895 (9th Cir. 1974); Dodge v. Giant Food, Inc., 488 F.2d 1333 (D.C. Cir. 1973).

employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action.  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted); Torres v. Deblasis, 959 F. Supp. 2d 772, 781 (E.D. Pa. 2013).  Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to advance a legitimate, non-retaliatory reason for the adverse action.  Crumpton v. Potter, 305 F. Supp. 2d 465, 474 (E.D. Pa. 2004) (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)).  Because the plaintiff still has the ultimate burden of proof of retaliation, if the defendant advances a legitimate, non-retaliatory reason, the plaintiff must show that defendant's proffered reason is merely pretext. Madden v. Runyon, 899 F. Supp. 217, 222 (E.D. Pa. 1995).

### 1.  Prima Facie Case

#### a.  Protected Activity & Adverse Employment Action

The parties agree that on May 3, 2011 and November 14, 2011, McNeill filed complaints with the EEOC and with the Pennsylvania Human Rights Commission.  McNeill engaged in protected activity by filing these complaints.  On January 3, 2013, Greyhound terminated McNeill.

#### b.  Causal Connection

Although McNeill has set forth sufficient proof to satisfy the first two elements of the retaliation claim, this claim nonetheless fails because McNeill has made no showing that the third element, that is, that there was a causal connection between his participation in the protected activity and the adverse employment action, is satisfied.

The Supreme Court recently held that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged

adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013); see also Verma v. Univ. of Pa., 533 F. App'x 115, 119 (3d Cir. 2013). Case law in the Third Circuit has elaborated various ways in which a plaintiff can demonstrate the causal link necessary to establish a prima facie case of retaliation. A causal link "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Madden, 899 F. Supp. at 222 (quotation marks and citation omitted). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007).

However, a causal link can exist even if a significant amount of time has elapsed between the protected conduct and the adverse employment action. See Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993) ("The mere passage of time is not legally conclusive proof against retaliation."); Crumpton, 305 F. Supp. 2d at 476. In the absence of temporal proximity between the protected conduct and alleged retaliation, "a plaintiff may still make out the causal link by producing circumstantial evidence of a pattern of antagonism following the protected activity." Alderfer v. Nibco, Inc., No. 98–6654, 1999 WL 956375, at *5 (E.D. Pa. Oct. 19, 1999) (mem.) (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997); Robinson, 982 F.2d at 895). Beyond timing and ongoing antagonism, a plaintiff may "substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference," such as when an employer provides inconsistent explanations for terminating an employee. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).

McNeill fails to establish a causal connection through timing, ongoing antagonism, or any other types of circumstantial evidence that could support the inference of retaliatory motive. First, McNeill admits that his termination occurred "[m]ore than one year" after he filed his second EEOC complaint.[10]  Pl.'s Opp. at 1.  McNeill filed his second EEOC complaint on November 14, 2011, immediately after he was suspended.  On January 3, 2013, more than one year later, Greyhound fired McNeill.  Because more than thirteen months elapsed after McNeill engaged in protected activity until Greyhound fired him, McNeill cannot create an inference of causation without more evidence to link the two.  LeBoon, 503 F.3d at 233.

Second, McNeill has not shown a "pattern of ongoing antagonism" following his second EEOC filing in November 2011.  Crumpton, 305 F. Supp. 2d at 476.  McNeill cannot recall whether anyone at Greyhound commented when he filed EEOC complaints.  Pl.'s Dep. 423:16-434:17.  There is no evidence in the record that McNeill's supervisors continued to comment on his hairstyle and McNeill was not disciplined for violating the grooming policy after he filed his second EEOC complaint.

Third, McNeill does not offer other circumstantial evidence sufficient to establish a causal link.  McNeill argues that "after Greyhound learned of [his] EEOC complaint, Greyhound laid in wait for the next opportunity to get rid of the 'troublemaker.'"  Pl.'s Opp. at 1.  McNeill relies on his Fleischhauer directive theory to link his EEOC complaints with his termination.  As

---

[10] In his brief in opposition to Greyhound's Motion for Summary Judgment, McNeill argues only that Greyhound retaliated against him by terminating him.  I note for the record that McNeill was suspended for three days in November 2011, nearly six months after he filed his first EEOC complaint.  In his November 2011 EEOC complaint, McNeill alleged that Greyhound retaliated against him for filing his first EEOC complaint in May 2011 by suspending him in November 2011.  Def.'s Br. Ex. U.  In Andreoli v. Gates, the Third Circuit concluded that a five-month gap between an employee's protected activity and an adverse employment action, without more, could not raise an inference of causation.  482 F.3d 641, 650 (3d Cir. 2007).  To the extent McNeill intended to assert a retaliation claim on this basis, there is no evidence in the record to suggest a retaliatory motive for McNeill's November 2011 suspension.  That claim cannot survive summary judgment.

discussed above, a thorough search of the record reveals no evidence to support this theory.  The

record does not support an inference of a causal connection between McNeill's prior protected

activity and his termination, let alone that his protected activity was a "but-for cause" of his

termination.  <u>Univ. of Tex. Sw. Med. Ctr.</u>, 133 S. Ct. at 2534.  McNeill has not established a

prima facie case of retaliation.

### c.   Legitimate, Non-Retaliatory Reason

Even assuming that McNeill could establish a prima facie case of retaliation, Greyhound

has produced a legitimate, non-retaliatory reason for terminating him.  As discussed above,

Greyhound fired McNeill after the Sugarloaf incident because of his unprofessionalism toward

Hawkins, the driver of the stranded bus, as well as his prior record.  These reasons are

documented in the January 3, 2013 termination record.  James, one of McNeill's supervisors who

was involved in making the termination decision, stated at his deposition that McNeill's EEOC

filings did not factor into the decision.  Although McNeill disagrees with Greyhound's

conclusion that the Sugarloaf incident warranted termination, Greyhound has met its burden.

### d.   Pretext

Assuming McNeill could establish a prima facie case of retaliation, he offers no specific

evidence that despite its proffered reason for firing him, Greyhound harbored a retaliatory motive

against him.  <u>Baur v. Crum</u>, 882 F. Supp. 2d 785, 806 (E.D. Pa. 2012).  McNeill argues that

Greyhound keeps an internal list of employees who have filed EEOC complaints "and that is the

only purpose of the report," but the report's existence alone does not support an inference of

discriminatory intent.  Pl.'s Opp. at 2.  McNeill provides no evidence about how Greyhound

presumably uses the internal report.  He provides no evidence that Greyhound retaliates against

employees who have filed complaints with the EEOC by taking adverse employment actions

against them.  McNeill's only evidence is that James knew of his EEOC filings and even accompanied him to an EEOC hearing.  Fleischhauer, the regional vice president, learned of McNeill's EEOC complaints only after McNeill was fired.

Beyond these "general, conclusory accusations," see Baur, 882 F. Supp. 2d at 806, McNeill does not provide any evidence to connect the Greyhound employees' knowledge of his protected activity with the termination decision.  Even if he had established a prima facie case of retaliation, McNeill has not made the requisite showing of pretext.  Therefore, I will grant Greyhound's motion for summary judgment on McNeill's retaliation claim.

## IV.  CONCLUSION

For the reasons set forth above, I will grant Greyhound's motion for summary judgment on all of McNeill's remaining claims.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: